## No. 7289.

### Mrs. Bertha Lewis et al. vs. Widow J. F. Pepin, Tutrix.

An Appeal cannot be dismissed on the ground that it was taken by a tutrix, defendant in the case, and that her wards were of age at the time and should have taken the Appeal themselves,—when the Record does not show that said wards were made parties to the suit at their majority.

The failure of the lessor to make necessary repairs, does not afford the lessee a legal reason for not paying the rent, or sustain a claim for the damage suffered by his furniture from the bad condition of the leased premises,—when the rent is sufficient to enable the said lessee to make the repairs himself. Previous Decisions affirmed.

This principle is equally applicable when the lessee has furnished rent notes, if they are still in the hands of the lessor.

APPEAL from the Sixth District Court for the parish of Orleans. *Rightor*, J

*B. R. Forman* for Plaintiffs and Appellees.

*Chs. F. Claiborne* for Defendants and Appellants.

## On Motion to Dismiss.

The opinion of the Court was delivered by

DeBlanc, J. In July, 1868, Mrs. Bertha Lewis leased certain houses in this city from A. Rochereau & Co., as agents of the heirs of J. F. Pepin, who then resided in France.

According to the allegations of a petition filed in the Second District Court of the parish of Orleans, by the said A. Rochereau & Co., to be recognized as the agents of Mrs. Widow Pepin, in her own name and as natural tutrix of her children, the lessors of plaintiff, those children were born—one in April, 1852, the other in April, 1855, and became of age, the oldest in 1873, the youngest in 1876.

On the 3rd of May, 1870, Mrs. Lewis brought suit to annul the lease made in 1868, and to recover damages which she charges resulted from a failure on the part of her lessors to comply with their contract.

Though they and their tutrix were represented in this city by A. Rochereau & Co., who had been recognized as their agents by the court and by the plaintiff, the tutrix appears to have been cited to defend said

suit "by posting and through a curator *ad hoc*"; as to said agents, they were made parties to the instituted action for the sole purpose of enjoining them from negotiating, and compelling them to return the rent notes subscribed by and delivered to them by Mrs. Lewis as lessee.

· At the inception of this litigation, there were in court and in this case but two defendants, Mrs. Widow Pepin as tutrix, the firm of A. Rochereau & Co., as holders of the lessee's notes. The case was tried and judgment rendered against *defendant*, · annulling the lease, and condemning *defendants* to pay seventeen hundred and fifty dollars and return the rent notes.

From that judgment a suspensive appeal was prayed for and allowed, on motion of Charles F. Claiborne, of counsel for *defendant*. The record contains the mention that at the trial Mr. Claiborne appeared for Mr. Bermudez, defendants' counsel. The bond of appeal is in the name of Widow J. F. Pepin et al., and recites that: " Whereas, the above bounded Widow J. F. Pepin, tutrix, et al., *has* this day filed a motion of appeal from a judgment rendered *against her*, etc.

Mrs. Lewis took a rule in the lower court to dismiss this appeal, on three different grounds, only one of which is now urged, and that is that the heirs of Pepin are of age and they have not appealed. To establish that they have attained the age of majority, the only evidence adduced on the trial of the rule is the petition of A. Rochereau & Co., addressed to the Second District Court, and in which the children's age is mentioned. That rule was discharged by the District Judge, and the motion to dismiss renewed in this Court.

The heirs of Pepin were under age when this suit was brought, and it does not appear that, at any time, they were made or made themselves parties to said suit; and if, as contended, from 1876 neither of them could have been legally represented by their mother and tutrix, because at that date they alone could have stood in judgment, the validity of the decree rendered against them in 1878 would be at least questionable.

The documents to which we have been referred do not sustain the assertion that the heirs of Pepin have, since their alleged majority, appeared in court by counsel or otherwise. The defendant and the defendants therein alluded to are the tutrix and her agents, and the cause urged for the dismissal of the appeal might, if it were to prevail, extend to and affect the validity of the judgment appealed from and blot out the result of a protracted litigation.

Were the unsworn allegations of the petition of A. Rochereau & Co. considered as sufficient evidence of the heirs's majority, though it is manifest that the ascertaining of their age was absolutely foreign to the object of that petition, where is the evidence that they were ever informed,

either by their tutrix, or by any other, and in any way, that there was pending in one of the courts of a distant State a suit in which they would have to file an appearance.

Was it not incumbent on plaintiff, as soon as she ascertained that those heirs were of age, to have notified them of the institution and pendency of her suit; and can she now, taking advantage of her own laches, claim the dismissal of an appeal allowed to one of the only defendants who were in court when the case begun, when it was tried and when it was decided ? C. P., 120. We think not, and, in the interest of plaintiff and defendants, the motion to dismiss is overruled.

## On Application for Rehearing.

We thought and still think questionable that a judicial admission made, not by a tutrix herself, but by her agent, and made, not in *a suit* actually pending against her wards, but in a previous proceeding, can, in a subsequent suit against those wards, be justly considered as the highest evidence of the fact acknowledged in the agent's admission.

Be this as it may, the Civil Code expressly provides that a tutor administers by himself alone—Art. 351. The Code of Practice, "that action *against* minors must be brought directly against their tutors—C. P. 115; and that in all suits brought in their name, their tutors *act themselves without making them parties* to the actions—C. P. 109. They are sued or sue through the interventions of their tutors—C. P. 108.

The Code of Practice also provides that all suits brought against curators and *other administrators* (in the last mentioned class tutors are included), and brought *during* the time of their administration, shall, *after* the expiration of their time as to tutors, that is, when their wards attain the age of majority, and even after they, the curators and other administrators, have rendered their accounts to the heirs, be continued and tried without any other formality, except that of *making the heirs parties*, which shall be ordered by the court on motion of any one of the parties, or on application of such heirs themselves. C. P. 120.

How, in a court of record, do we ascertain who are or have been made parties to a suit ? Is it by merely inquiring *who ought* to have been cited or notified, or is it by opening the file and referring to citation and notices, if any there be, and to the returns thereon ? By what fiction of the law can those who were minors, and not in court when a suit was commenced, be *presumed* to be in court on the very day on which they attain their majority, though the contrary may appear ?

In "Martel vs. Richard," what did the court hold ? That the tutor represents the minors so completely, that when he has once brought a suit for them, or answered an action against them, no further *petition* or *answer* can be required on their behalf, and the court added: "That

care should be taken in an action of that kind, that judgment should be rendered in favor of those heirs who have attained their majority, as well as the tutor of those who are still minors." The court meant that a suit properly brought by the tutor for his ward may be prosecuted by the ward, as a plaintiff, after attaining his majority, without the necessity of a new citation or any change in the tutor's pleadings, but it did not hold that a valid judgment can be rendered against a defendant who has not been cited or notified, and has not appeared.

If the court had so decided—if it had decided that the fact that, when the suit was filed, the tutor alone was in court, created, as to that suit, a tacit agency, and, by implication, empowered the tutor to continue representing his ward, after the latter had attained the age of majority, then, under the quoted authority, the appeal taken by the tutrix of defendants would be properly before us. 15 An. 598.

We have here, as parties to this appeal, all those who appear to have been in the lower court from the inception of this suit until this appeal was granted, and no cause has been shown to justify its dismissal.

The rehearing is, therefore, refused.

---

## ON THE MERITS.

The opinion of the Court was delivered by

FENNER, J. In July, 1868, plaintiff leased from defendants, through the latter's agents, A. Rochereau & Co., the buildings known as the Orleans Hotel, for the term of two years from October 1st following, at a stipulated rent of $2400 *per annum*, represented by plaintiff's negotiable notes for $200 each, payable monthly during the whole term of the lease.

It was expressly stipulated in the lease that the lessee should "keep the premises in good order, condition and repair during said lease," and, at its expiration, " should deliver said premises unto the said lessors in like good order, condition and repair in which she received them, the usual decay and unavoidable causes only excepted."

She entered upon the occupancy of the premises, and paid her rent notes to the defendants for nineteen months, up to May, 1870, when she instituted the present suit, claiming the annulment of the lease, and the cancellation and return of the five unpaid rent notes; enjoining Rochereau & Co. from parting with the possession of the notes; and demanding $7000 as damages resulting from the failure of defendants to perform their obligations as lessors. She alleges, in substance, that almost immediately after taking possession of the premises, she discovered that the roof leaked badly and did not protect the furniture; that she immediately made demand of said Rochereau & Co. to repair the roof, which

they failed to do; that the roof grew worse and worse until the house became untenantable; that during every hard rain the rooms were flooded, in consequence of which her furniture had been damaged to the amount of $4500, and she had suffered a further loss of custom and profit in her business of hotel-keeping to the amount of $2500.

The defendants answer, in substance, that the premises had been delivered in good order; that plaintiff was bound, by her contract, to keep them in good repair; that, when notified that the roof needed attention, although not so bound, they sent workmen to put it in repair; that it was ascertained that the cause of its leaking was the negligence and misconduct of plaintiff and her employees in walking upon the roofs and valleys, stretching clothes-lines and hanging clothes thereon, and throwing broken bottles, rags, dirt and filth in the gutters so as to obstruct them and cause the leakage; that even if defendants were in fault, plaintiff cannot recover damages because she had the right to make the repairs and deduct the cost from the rent. Defendants demand, in reconvention, judgment for the unpaid rent-notes and $1000 as damages for injury to the house resulting from the leakage caused by her acts.

From a judgment in favor of plaintiff for $1750 damages, annulling the lease, cancelling the unpaid notes and rejecting the reconventional demands of defendants, the latter have appealed.

There seem to be several sufficient reasons why this judgment cannot be sustained:

1st. The express undertaking of plaintiff, in her lease, to keep the premises in good repair, relieved the defendants from the obligation which the law would otherwise have imposed on them, of making repairs to the roof. The stipulation that she should return the premises " in like good order, condition and repair in which she received them " certainly strongly suggests an implied acknowledgment that she received them in good order, condition and repair. The evidence establishes that she had occupied the premises, under a sub-lease, for several months prior to the commencement of this lease, and she should, therefore, have known its condition. There is no evidence to establish that immediately prior to, or at the time when the lease begun, the roof was in bad condition. It is proved, on the contrary, that the defendants had employed a competent workman to put the roof in repair, who had done the work and guaranteed it for twelve months.

2d. The evidence as to the cause of the leakage is extremely conflicting. It is conclusively proved that the roof was used for drying and bleaching clothes; and that slops, chamber dirt, old shoes, rags, broken bottles, a flannel shirt, an india-rubber coat and such articles were, at various times, found on the roof and in the valleys and gutters, ob-

structing and choking them up; and sundry competent witnesses testify that this was a sufficient, and the actual, cause of the leaking. Plaintiff's evidence as to the fact of leakage and as to damage is certainly complete; but it must be conceded that, as to the cause of the leakage, the testimony on her side is of the weakest character and the evidence overwhelmingly preponderates in favor of the theory of defendant, not only in the number of the witnesses on that point, but in their capacity to judge and in their opportunities of knowledge. It was essential to plaintiff's success that she should establish with clearness and certainty, that the damage resulted from the fault of defendants and not from her own, or that of her employees and customers. This she has failed to do.

3d. The judicial construction of Art. 2694 C. C., is to the effect that the failure of the lessor to make repairs will not sustain a claim for damages by the lessee, when the rent is sufficient to enable the lessee to make them, because, in such case the lessee is authorized to make them himself and to deduct the cost from the rent. However questionable this construction might appear, as an original proposition, it is too ancient and well established to admit of disturbance at this date. 4 Rob. 428; 21 An. 714; 22 An. 292; 23 An. 59; 26 An. 384; 28 An. 903; and Lawrence vs Lelièvre, unreported, Op. Bk. No. 50, p. 57.

In the last mentioned case, it was held that the application of the doctrine was not prevented by the circumstance that negotiable notes had been given for the rent, at least in absence of proof that the notes had been negotiated. Here it well appears that they had not been negotiated and that the plaintiff knew the fact. The notes were always paid by her to defendants' agent, and, in some cases, she applied for, and obtained concessions on her rent, on account of bad business. She might, at any time, have prevented their negotiation by the same proceeding which she effectually used with reference to the last five notes of the series.

She claims, however, that the repairs would have exceeded the amount of rent for any single month and she was not bound to advance a greater sum. We are not satisfied that such was the fact, but, if it were, she had only to withhold payment during the period necessary to accumulate a sufficient amount of rent due; and could only hold the lessor for damages accruing during that period.

4th. Plaintiff's conduct during the whole transaction shuts out her claim from all equitable consideration. During nineteen months, in which the enormous damage claimed by her was accumulating, she says not a word to defendants' agents about holding them responsible therefor. On the contrary, she went regularly forward paying them the rent every month—acts certainly inconsistent with the idea that she considered

them to be indebted to her for a much larger amount. It appears, as before stated, that she even applied to them, in some cases, for concessions on her rent, on account of bad business, which were allowed. At the end of nineteen months, on the eve of the dull summer season preceding the termination of her lease, she, for the first time, springs upon the defendants a claim for damages nearly doubling the entire rental of the property for the whole two years, and claims a rescission of the lease and a cancellation of the maturing rent-notes. See Campbell vs. Miltenberger, 26 An. 72, many of the principles announced in which are strikingly applicable to this case.

While we do not hold that the payment of rent operated a legal waiver of the claim for damages, it is a circumstance strongly suggesting that she did not, during all this period, herself consider defendants her debtors for the large amount now claimed, and confirming the probability of defendants' position that they were not so bound.

Even after the institution of the suit, she continued to occupy the premises down to the very end of the lease; availing herself, however, in the meantime, of the pendency of the suit, to sell out her furniture, and to deprive the landlord of his lien thereon for rent.

We are constrained to reject her claim for damages and to hold her liable for the unpaid rent.

It is, therefore, adjudged that the judgment appealed from be annulled and reversed; and it is now adjudged and decreed that plaintiff's demands be rejected, and that defendants have judgment in reconvention against plaintiff in the sum of one thousand dollars, amount of unpaid rent notes, with five per cent per annum interest on the amount of each note from the date of its maturity; plaintiffs to pay costs of the lower court and of this appeal.

The Chief Justice recuses himself, having been of counsel.